705 S.E.2d 111

**Debbie L. ULLOM, Petitioner Below, Appellee**

v.

**Joe E. MILLER, Commissioner, West Virginia Division of Motor Vehicles, Defendant Below, Appellant.**

No. 34864.

Supreme Court of Appeals of West Virginia.

Submitted March 9, 2010.

Decided Nov. 23, 2010.

Darrell V. McGraw, Esq., Attorney General, Scott E. Johnson, Esq., Assistant Attorney General, Charleston, WV, for Appellants.

Jason M. Glass, Esq., Todd F. La Neve, Esq., La Neve Law Offices, Jane Lew, WV, for Appellee.

Marvin W. Masters, Esq., Richard A. Monahan, Esq., The Masters Law Firm, LC, Charleston, WV, for Amicus Curiae, West Virginia Troopers' Association, Inc.

BENJAMIN, Justice:

The respondent below and appellant, Joe E. Miller, Commissioner of the West Virginia Division of Motor Vehicles ("the Commissioner"), appeals from an order of the Circuit Court of Marshall County, West Virginia, entered on November 12, 2008. In its order, the circuit court reversed the Commissioner's administrative order revoking appellee's license to operate a motor vehicle in West Virginia following appellee's arrest for driving under the influence of an intoxicating substance ("DUI"). In reversing the Commissioner, the circuit court found that the arresting officer did not have the "requisite reasonable suspicion" to detain the appellee, Ms. Debbie Ullom ("appellee"), and that the appellee was later acquitted of the related criminal charges arising from this arrest. After careful consideration of the parties' arguments, the briefs of the parties,[1] the record designated for our consideration, and relevant authorities, we reverse the decision of the circuit court.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

This appeal is brought on behalf of the Commissioner and seeks review of the November 12, 2008, order of the Circuit Court of Marshall County, which reinstated the driving privileges of the appellee. Ms. Ullom's driving privileges were at risk because of her arrest on June 26, 2006, for driving under the influence of an intoxicating substance. After Ms. Ullom's arrest on criminal charges, the Commissioner initiated license revocation proceedings pursuant to West Virginia Code § 17C-5A-1(c).[2] Ms. Ullom

---

1. We wish to acknowledge the amicus curiae brief submitted by the West Virginia Troopers Association, Inc.

2. W. Va.Code § 17C-5A-1(c) (2004) states:

If, upon examination of the written statement of the officer and the test results described in subsection (b) of this section, the commissioner determines that a person committed an offense described in section two, article five of this chapter or an offense described in a municipal ordinance which has the same elements as an offense described in said section and that the results of any secondary test or tests indicate that at the time the test or tests were adminis-

tered the person had, in his or her blood, an alcohol concentration of eight hundredths of one percent or more, by weight, or at the time the person was arrested he or she was under the influence of alcohol, controlled substances or drugs, the commissioner shall make and enter an order revoking the person's license to operate a motor vehicle in this state. If the results of the tests indicate that at the time the test or tests were administered the person was under the age of twenty-one years and had an alcohol concentration in his or her blood of two hundredths of one percent or more, by weight, but less than eight hundredths of one percent, by weight, the commissioner shall

timely requested an administrative hearing before an administrative law judge. This hearing was commenced on September 29, 2006. At the hearing on this matter, the arresting officer, West Virginia State Trooper R.J. Buskirk testified about the facts and circumstances giving rise to the appellee's arrest. The trooper stated that while he was on routine patrol at dusk around 8:39 p.m. on June 26, 2006, he observed a white Subaru parked off the side of the road, clearly off the roadway, with its parking lights on. The location of the car was not in the way of oncoming traffic and the car was parked in front of a chain gate blocking what appeared to be a dirt road leading to a field. The vehicle's emergency flashers were not engaged. There was no indication, in the form of a light, towel, scarf or other physical object hanging from the driver's side window, that there was a need for assistance. The car's engine was not running. Trooper Buskirk testified at the revocation hearing that he did not observe the operator of the Subaru driving in any unacceptable manner. He testified that he initiated a road safety check of the vehicle by stopping his cruiser and approaching the vehicle. He determined that the appellee was the only occupant of the car. As he was talking to the appellee, the trooper noted that the keys were in the ignition and the driver's seat was "in an upright manner that would corroborate with" the appellee's height. The officer noted that appellee had glassy, bloodshot eyes and was speaking with slurred speech. The appellee's motor skills were unsteady. The officer also detected a strong odor of an alcoholic beverage. The trooper requested that the appellee perform a series of field sobriety tests, including the horizontal gaze nystagmus, one-leg stand and walk-and-turn. At the hearing, the officer stated the appellee failed all these tests as well as a preliminary breath test. The appellee was then placed

under arrest for driving under the influence and was transported to the Marshall County Sheriff's Office. While a secondary breath analysis was attempted, the appellee failed to provide sufficient samples and thus, no testing was completed. While in police custody, the appellee admitted to drinking approximately four beers and to driving the Subaru on a public highway.

After the arrest, the trooper completed and filed with the Commissioner a document entitled "Statement of Arresting Officer," triggering the start of the administrative driver's license revocation proceeding. By letter dated July 13, 2006, the Commissioner suspended the driving privileges of the appellee effective August 17, 2006. The appellee timely filed a request for a hearing five days later on July 18, 2006.

In the subsequent administrative hearing, the hearing officer found that while the arresting officer did not observe the appellee driving, "all of the surrounding circumstances indicate that the white Subaru could not otherwise have been in its location unless driven there by the petitioner [appellee]." In terms of a justification for the stop, the hearing examiner found that "a vehicle in such a position off a rural roadway, with its parking lights engaged, would reasonably lead a police officer to initiate a road safety check." Therefore, the hearing officer found that any observations made by the arresting officer following his initial contact with the appellee were properly a part of the record upon which the revocation was based.

By order dated December 18, 2006,[3] the appellee's driver's license was suspended for a period of six months effective with the date of the order. The appellee thereupon filed a petition for judicial review in the Circuit Court of Marshall County on November 13, 2006.

make and enter an order suspending the person's license to operate a motor vehicle in this state. A copy of the order shall be forwarded to the person by registered or certified mail, return receipt requested, and shall contain the reasons for the revocation or suspension and describe the applicable revocation or suspension periods provided in section two of this article. A revocation or suspension shall not

become effective until ten days after receipt of a copy of the order.

3. While the effective date on the DMV order is December 18, 2006, it appears that this order is postdated inasmuch as the request for judicial review of this same order was filed on November 13, 2006.

In its November 8, 2008, order reversing the DMV's revocation, the circuit court ruled that "the Arresting Officer did not have reasonable suspicion to make an investigatory stop and make a lawful arrest of the petitioner [Appellee] for driving under the influence of alcohol. The facts in the instant case and the testimony of the Arresting Officer provided indicate that the petitioner [Appellee] did not commit, was not committing, and was not going to commit a crime pursuant to the requirements for reasonable suspicion." The circuit court found that there was insufficient admissible evidence presented to show by a preponderance of the evidence that the appellee had committed the offense of driving under the influence of alcohol. The circuit court further found that the DMV was required to give substantial weight to the appellee's subsequent acquittal on the related driving under the influence charges, even though the related criminal proceeding occurred *after* the revocation hearing had already been completed. The Commissioner appealed the circuit court's order reversing the administrative suspension to this Court. This Court accepted the matter for appeal on April 30, 2009.

## II.

### STANDARD OF REVIEW

■ The Commissioner appeals a circuit court order reversing its revocation of Ms. Ullom's driver's license. This Court applies the same standard of review that the circuit court applied to the Commissioner's administrative decision, meaning that we give deference to the Commissioner's purely factual determinations, but we give a *de novo* review to legal determinations. Thus, "[o]n appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va.Code § 29A–5–4(a) and reviews questions of law presented *de novo*; findings of fact by the administrative officer are accorded deference unless the

reviewing court believes the findings to be clearly wrong." Syllabus Point 1, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996). "In cases where the circuit court has amended the result before the administrative agency, this Court reviews the final order of the circuit court and the ultimate disposition by it of an administrative law case under an abuse of discretion standard and reviews questions of law *de novo*." Syllabus point 2, *Muscatell v. Cline*, 196 W.Va. 588, 474 S.E.2d 518 (1996).

## III.

### DISCUSSION

This appeal presents two issues for consideration by the Court: first, was the evidence upon which the appellee's license revocation was based properly obtained by Trooper Buskirk during his encounter with the appellee, or was it properly suppressed by the circuit court pursuant to the Fourth Amendment of the United States Constitution and pursuant to Section 6 of Article III of the Constitution of West Virginia; and second, in its consideration and decision, did the circuit court improperly consider matters in the appeal of the administrative revocation which were not present in the administrative hearing record that was developed before the Commissioner. We shall address each issue in turn.

### A. The "Community Caretaker" Doctrine for Law Enforcement Personnel in West Virginia

■ The Fourth Amendment to the United States Constitution and Article III, Section 6 of the Constitution of West Virginia protect the public from unreasonable searches and seizures by governmental officials.[4] These protections come into play when a citizen is "seized" by a government actor such as a police officer. A person has been "seized" within the meaning of our "search and seizure" jurisprudence when, in view of the context of all the circumstances

---

4. The Fourth Amendment applies to the states through application of the Fourteenth Amendment of the United States Constitution. *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 1691, 6 L.Ed.2d 1081, 1090 (1961). Article 3, Section 6 of the West Virginia Constitution is generally construed in harmony with the Fourth Amendment of the United States Constitution. *State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973). *But see State v. Mullens*, 221 W.Va. 70, 650 S.E.2d 169 (2007).

surrounding the incident, a reasonable person would believe that he is not free to leave. *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565, 572 (1988) (*quoting United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980) (opinion of Stewart, Rehnquist, J.J.)); *see also State v. Todd Andrew H.,* 196 W.Va. 615, 619–20, 474 S.E.2d 545, 549–50 (1996) (applying *Chesternut* standard to Article III, Section 6 of the Constitution of West Virginia).[5]

 Not all contact between a police officer and a citizen rises to the level wherein constitutional protections are implicated. A "consensual" encounter may occur where a citizen agrees to speak to law enforcement personnel. Such a contact may be initiated by law enforcement without the need of any objective articulable level of suspicion and does not, without more, amount to a "seizure" raising constitutional protections. *See* Syl. Pt. 1, *State v. Mays,* 172 W.Va. 486, 307 S.E.2d 655 (1983) ("It is not an unreasonable seizure for police to approach an individual in a public place, ask him if he is willing to answer questions and put questions to him if he is willing to listen."); *United States v. Cooper,* 43 F.3d 140, 145, (5th Cir.1995) (" '[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual's identification . . . and request consent to search his or her luggage . . . as long as the police do not convey a message that compli-

ance with their request is required' " (quoting *Florida v. Bostick,* 501 U.S. 429, 435, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 398–99 (1991))). *See also Muehler v. Mena,* 544 U.S. 93, 101, 125 S.Ct. 1465, 1471, 161 L.Ed.2d 299, 308 (2005). Such encounters are permissible because they are purely consensual and involve no seizure.[6]

 Where an encounter rises to the level of a "search" or "seizure," both the Fourth Amendment and Article III, Section 6 require the search or seizure to be reasonable and that the governmental actor have probable cause and, absent a recognized exception, a validly issued warrant. Accordingly, searches and seizures performed without a valid warrant are presumed to be unreasonable, and will be lawful only if the search and seizure falls within a recognized exception to the warrant requirement. *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 575–576 (1971); *accord Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967) (valid warrant requirement supported by probable cause "subject only to a few specifically established and well-delineated exceptions"). In Syllabus Point 20 of *State v. Ladd,* 210 W.Va. 413, 557 S.E.2d 820 (2001), this Court explained as follows:

"Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under

---

**5.** As the United States Supreme Court noted, "The test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979, 100 L.Ed.2d at 572.

**6.** Thus, "mere police questioning does not constitute a seizure. Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual." *Muehler,* 544 U.S. at 101, 125 S.Ct. at 1471, 161 L.Ed.2d at 308. *See also Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983), wherein a plurality of the United States Supreme Court concluded

[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. [Internal citations omitted.] Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. [Internal citations omitted.] The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. [Internal citations omitted.] *Royer,* 460 U.S. at 497–98, 103 S.Ct. at 1324, 75 L.Ed.2d at 236.

the Fourth Amendment and Article III, Section 6 of the West Virginia Constitution-subject only to a few specifically established and well-delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative." Syllabus Point 1, *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980), *overruled in part on other grounds by State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991). *See also State v. Bookheimer*, 221 W.Va. 720, 656 S.E.2d 471 (2007); *State v. Kendall*, 219 W.Va. 686, 639 S.E.2d 778 (2006). Examples of recognized exceptions to the general warrant requirement include certain brief investigatory stops, searches incident to a valid arrest, seizures of items in plain view, searches and seizures justified by exigent circumstances, consensual searches, and searches in which the special needs of law enforcement make the probable cause and warrant requirements impracticable. *Warrantless Searches and Seizures*, 37 Geo.L.J. Ann.Rev.Crim.Proc. 39, 40 (2008). *See also State v. Duvernoy*, 156 W.Va. 578, 195 S.E.2d 631 (1973).

 One well-recognized exception to the general warrant requirement of the Fourth Amendment and Article III, Section 6, known as a *"Terry* investigative stop," authorizes a police officer to briefly seize an individual so long as the seizure is supported by a reasonable articulable suspicion that the individual has committed or is about to commit a crime. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). For purposes of Article III, Section 6 of the Constitution of West Virginia, we too have recognized the so-called *"Terry* investigative stop" exception to the general warrant requirement. In *State v. Stuart*, 192 W.Va. 428, 452 S.E.2d 886 (1994), we held that "[p]olice officers may stop a vehicle to investigate if they have an articulable reasonable suspicion that the vehicle is subject to seizure or a person in the vehicle has committed, is committing, or is about to commit a crime...." *Stuart* at Syl. Pt. 1. We further recognized in *Stuart* that "[w]hen evaluating whether or not particular facts establish reasonable suspicion,

one must examine the totality of the circumstances, which includes both quantity and quality of the information known to the police." *Id.*, at Syl. Pt. 2. The need for flexibility in the consideration of such circumstances was recognized by the United States Supreme Court when it stated that "[s]treet encounters between citizens and police officers are incredibly rich in diversity.... Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute a crime." *Terry*, 392 U.S. at 13, 88 S.Ct. at 1875–76, 20 L.Ed.2d at 901.

██ Here, Trooper Buskirk, while on routine patrol at dusk, encountered a motor vehicle pulled fully off the road and parked in front of a chain gate blocking what appeared to be a dirt road leading to a field. He had not viewed the vehicle being operated. The vehicle's parking lights were on, but the engine was off. There was no overt indication, such as flashers operating or a white towel hanging from the vehicle, that there was a need for assistance. Trooper Buskirk testified that he believed a safety check was needed and proceeded to make contact with the appellee. In these circumstances, a *Terry/Stuart* exception was not initially present.

On appeal, the Commissioner urges this Court, consistent with the requirements of the Fourth Amendment and Article III, Section 6, to hold that Trooper Buskirk's "community caretaker" motivation for stopping and interacting with appellee constitutes a constitutionally permissible warrantless encounter with appellee. Specifically, when the totality of the circumstances of this encounter are considered, the Commissioner contends that Trooper Buskirk herein was acting in a legitimate community safety and welfare role when he initiated the warrantless contact with Ms. Ullom, and that the circumstances of this warrantless encounter are therefore properly admissible into evidence in subsequent legal proceedings, including the administrative revocation hearing below, as an exception to the general warrant requirement of the Fourth Amendment and Article III, Section 6.

■ The "community caretaker" doctrine is a widely recognized exception to the general warrant requirement of the Fourth Amendment of the United States Constitution. The doctrine recognizes that, in our communities, law enforcement personnel are expected to engage in activities and interact with citizens in a number of ways beyond the investigation of criminal conduct. Such activities include a general safety and welfare role for police officers in helping citizens who may be in peril or who may otherwise be in need of some form of assistance.

The community caretaker exception to the constitutional prohibition against unreasonable warrantless searches and seizures was first acknowledged by the United States Supreme Court in *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In *Cady,* the United States Supreme Court recognized that because of the extensive regulation of motor vehicles by states and localities and the frequency with which such vehicles may become disabled or involved in accidents, police officers may properly engage in "community caretaker functions" related to such vehicles. *Id.,* 413 U.S. at 441, 93 S.Ct. at 2528, 37 L.Ed.2d at 714. Such encounters between law enforcement personnel and citizens related to public safety and welfare are "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.*

In *Cady,* a police officer from Chicago was involved in an automobile accident in Wisconsin. When Wisconsin law enforcement authorities arrived on the scene of the accident, the Chicago officer appeared to be intoxicated and was transported to the hospital, where he lapsed into a coma. His car was towed to a nearby garage. Believing that Chicago police officers were required to carry their service weapons at all times, the Wisconsin authorities returned to Dombroski's wrecked vehicle and began a warrantless search for that weapon. This search of Dombroski's vehicle revealed numerous items that appeared to have blood on them. Dombroski's attorney told the investigating officers that a body might be found on the farm of Dombroski's brother in Wisconsin. Authorities later found a body on the brother's property and Dombroski was arrested.

Prior to his trial, Dombroski filed a motion to suppress the evidence obtained from the warrantless search of his car, arguing that the search violated Fourth Amendment principles. The United States Supreme Court disagreed, finding

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Cady,* 413 U.S. at 441, 93 S.Ct. at 2528, 37 L.Ed.2d at 714–715. The Supreme Court concluded that the evidence found in the search of Dombroski's vehicle was admissible and Dombroski's murder conviction, obtained largely on circumstantial evidence, was thereby upheld.

Since *Cady,* a majority of states have acknowledged this community safety and welfare role of police officers and have adopted in some form or another a "community caretaker" exception to the general warrant requirement present in such states.[7] While we

7. *See, e.g., Duck v. State,* 518 So.2d 857, 859–60 (Ala.Crim.App.1987) (recognizing assisting persons in need of aid falls within community caretaker function of police and gives officer legal right to be present in a viewpoint for plain view search); *Crauthers v. State,* 727 P.2d 9, 10–11 (Alaska Ct.App.1986) (finding requests for assistance from public fall within police officers' "community caretaker function"); *State v. Enos,* 2003 WL 549212, at *4 (Del.Super.Ct. Feb. 26, 2003) (holding seizure reasonable based on officer's "objective, reasonable and ar-

have not formally adopted the community caretaker doctrine as part of our "search and seizure" jurisprudence in West Virginia, we have recognized that law enforcement officers do have community safety and welfare duties beyond their criminal investigatory duties. In *Wagner v. Hedrick*, 181 W.Va. 482, 383 S.E.2d 286 (1989), we specifically acknowledged *Cady* in discussing the various roles of police officers in our communities, acknowledging a non-investigatory, community role for law enforcement personnel apart from traditional law enforcement duties:

> The more typical Fourth Amendment case involves a search that is initiated for the purposes of obtaining evidence of criminal activity. Certainly, however, we recognize that there are numerous instances in which the nature of a police officer's duty requires that he engage in searches for reasons other than obtaining evidence of criminal activity.

> The policeman, as a jack-of-all-emergencies, has "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses;" by default or design he is also expected to "aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," and "provide other services on an emergency basis." If a reasonable and good faith search is made of a person for such a purpose, then the better view is that evidence of crime discovered thereby is admissible in court.

*Id.*, 181 W.Va. at 489, n. 9, 383 S.E.2d at 293, n. 9 (quoting 2 LaFave, Search and Seizure: A Treatise on the Fourth Amendment, § 5.4(c) at 525 (2d ed.1987) (footnotes omitted.)).[8]

We now believe it is appropriate to join the majority of jurisdictions who recognize the community caretaker doctrine, formally recognizing the expectation in West Virginia that the role of law enforcement personnel is not limited to merely to the detection and prevention of criminal activity, but also encompasses a non-investigatory, non-criminal role of police officers to help to ensure the safety and welfare of our citizens. In recognizing this doctrine, however, we are mindful of the important protections of the Fourth Amendment and Article III, Section 6, relating to searches and seizures. In order to balance the caretaking role of police officers with the fundamental protections against unreasonable searches and seizures found in

---

ticulable suspicion ... defendant was in apparent peril, distress or need of assistance"); *People v. Luedemann*, 222 Ill.2d 530, 306 Ill.Dec. 94, 857 N.E.2d 187, 197 (2006) ("Community caretaking ... refers to a capacity in which the police act when they are performing some task unrelated to the investigation of crime [and may] uphold a search and seizure as reasonable...."); *Commonwealth v. Evans*, 436 Mass. 369, 764 N.E.2d 841, 843 (2002) (finding community caretaker function allowed trooper to investigate a vehicle parked in breakdown lane at night with blinker flashing to see if driver needed aid); *State v. Pinkham*, 565 A.2d 318, 319 (Me.1989) (recognizing a police officer's "legitimate role as a public servant to assist those in distress and to maintain and foster public safety"); *Kozak v. Comm'r of Pub. Safety*, 359 N.W.2d 625, 628 (Minn.Ct.App.1984) ("In the proper performance of his duties, an officer has not only the right but a duty to make a reasonable investigation of vehicles parked along roadways to offer such assistance as might be needed and to inquire into the physical condition of persons in vehicles."); *State v. Lovegren*, 310 Mont. 358, 51 P.3d 471 (2002) (holding officer has right to investigate if reasonable and articulable suspicion person is in need of help or in peril); *State v. Martinez*, 260 N.J.Super.

75, 615 A.2d 279, 281 (App.Div.1992) (holding investigating "abnormal" driving behavior in the middle of the night involves "community caretaker function"); *State v. Marcello*, 157 Vt. 657, 599 A.2d 357, 358 (1991) ("In some circumstances ... police officers without reasonable suspicion of criminal activity are allowed to intrude on a person's privacy to carry out 'community caretaking' functions to enhance public safety."); *State v. Acrey*, 148 Wash.2d 738, 64 P.3d 594, 599 (2003) (finding public looks to police to assist in a variety of non-criminal circumstances); *Bies v. State*, 76 Wis.2d 457, 471, 251 N.W.2d 461 (1977) (finding community caretaker function is an important and essential part of the police role and justified officer's presence in the alley where he obtained reasonable suspicion); *Wilson v. State*, 874 P.2d 215 (Wyo.1994) (finding community caretaker function justified brief inquiry into defendant's condition, including name and identification).

8. Although we acknowledged an important community safety and welfare role for West Virginia police officers in *dicta* in *Wagner*, adoption of the community caretaker doctrine was ultimately not at issue.

**12**

the United States Constitution and the Constitution of West Virginia, we believe it necessary to establish specific requirements for applicability of the community caretaker exception to ensure that the privacy expectations of West Virginia's citizens are balanced with the immediate safety and welfare needs of motorists or the public in situations where the immediate safety and welfare of citizens is reasonably at issue.

No single set of specific requirements for applicability of the community caretaker exception has been adopted by a majority of those states recognizing the exception. Based upon our review of the requirements established in other states, we believe that the requirements recently adopted by the Supreme Court of South Dakota in *State v. Deneui*, 775 N.W.2d 221 (S.D.2009), *cert. denied*, —— U.S. ——, 130 S.Ct. 2072, 176 L.Ed.2d 422 (2010), with modification, provide appropriate direction as we endeavor to best satisfy the reasonableness requirements of the Fourth Amendment and Article III, Section 6, and effect a necessary balance between the privacy expecta-

tions of West Virginia citizens and the need for police officers to properly execute their community caretaking duties.[9] Accordingly, after due consideration, we now hold that, for an encounter to come within the community caretaker doctrine exception to the warrant requirement, the State must establish the following:

1. Given the totality of the circumstances, a reasonable and prudent police officer would have perceived a need to promptly act in the proper discharge of his or her community caretaker duties;

2. Community caretaking must be the objectively reasonable, independent and substantial justification for the intrusion;

3. The police officer's action must be apart from the intent to arrest, or the detection, investigation, or acquisition of criminal evidence; and

4. The police officer must be able to articulate specific facts that, taken with rational inferences, reasonably warrant the intrusion.[10]

---

9. *See also People v. Ray*, 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928, 937 (1999), *cert. denied, Ray v. California*, 528 U.S. 1187, 120 S.Ct. 1240, 146 L.Ed.2d 99 (2000); *State v. Kramer*, 315 Wis.2d 414, 759 N.W.2d 598 (2009); *State v. Anderson*, 142 Wis.2d 162, 417 N.W.2d 411 (1987); *Laney v. State*, 76 S.W.3d 524, 529 (Tex.Ct.App.2002); *State v. Lovegren*, 310 Mont. 358, 51 P.3d 471 (2002); *State v. Ryon*, 137 N.M. 174 108 P.3d 1032 (2005); *Commonwealth v. Waters*, 20 Va.App. 285, 290, 456 S.E.2d 527, 530 (1995).

10. This holding is consistent with our previous recognition of other narrow exceptions to the general warrant requirement of the Fourth Amendment and Article 3, Section 6 in two similar areas involving the need for urgency: during emergencies and where exigent circumstances compel immediate action.

In *State v. Cecil*, 173 W.Va. 27, 311 S.E.2d 144 (1983), we held that the "emergency doctrine" permitted "a limited, warrantless search or entry of an area by police officers where (1) there is an immediate need for their assistance in the protection of human life, (2) the search or entry by the officers is motivated by an emergency, rather than by an intent to arrest or secure evidence, and (3) there is a reasonable connection between the emergency and the area in question." *Id.* 173 W.Va. at 32, 311 S.E.2d at 149. The application of the emergency doctrine requires the existence of a "compelling need to render imme-

diate assistance to the victim of a crime, or insure the safety of the occupants of a house when the police reasonably believe them to be in distress and in need of protection." *Id.* at 150. In requiring an immediate response to an immediate condition, the narrowness of the emergency doctrine greatly limits its practical applicability.

In *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996), we summarized the "exigent circumstances" exception to the general warrant requirement:

The test for the existence of exigent circumstances is whether the facts would lead a reasonable, experienced police officer to believe the evidence might be destroyed or removed before a warrant could be secured. There must be evidence both that an officer was "actually ... motivated by a perceived need to render aid or assistance" and "that a reasonable person under the circumstances must have thought that an emergency existed." *State v. Cecil*, 173 W.Va. 27, 32 n. 10, 311 S.E.2d 144, 150 n. 10 (1983).

196 W.Va. at 112 n.7, 468 S.E.2d at 727 n. 7. "Recognized situations in which exigent circumstances exist include: danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and hot pursuit of a fleeing suspect." *Id.*, 468 S.E.2d at 727 n. 7.

While the "emergency doctrine," "exigent circumstances" and the "community caretaker doc-

Here, in considering the propriety of Trooper Buskirk's actions, we must first determine, even prior to considering community caretaking, whether Trooper Buskirk's actions constituted a seizure implicating the protections set forth in the Fourth Amendment and Article III, Section 6 of the federal and state constitutions, respectively. We believe they did. Trooper Buskirk encountered Ms. Ullom's car lawfully parked just off the roadway, in front of a **chained private driveway,** with parking lights on and the engine turned off. While Ms. Ullom was free to go, the positioning of the officer at her window and the positioning of Trooper Buskirk's vehicle (which blocked in the Subaru) effectively stopped Ms. Ullom from doing so. Under such circumstances, we believe that in view of the context of all of these circumstances, a reasonable person would believe that she was not free to leave and thus a seizure occurred. *See Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979, 100 L.Ed.2d at 572; *Todd Andrew H.,* 196 W.Va. at 619–20, 474 S.E.2d at 549–50.

Trooper Buskirk did not have a warrant and did not, at least initially, have a reasonable articulable suspicion that a crime had been committed, was being committed, or was about to be committed. Nevertheless, we believe that the circumstances involved in his encounter with Ms. Ullom were reasonable and properly fell within the community caretaker doctrine exception to the Fourth Amendment of the United States Constitution and Article III, Section 6 of the Constitution of West Virginia. Trooper Buskirk's testimony establishes that Ms. Ullom's vehicle was parked just off the road in front of a chain gate blocking what appeared to be a dirt road leading to a field. It was dusk and her parking lights were on. Sensing that something might be wrong, Trooper Buskirk initiated what he termed a "road safety check."

In view of these objective, specific and articulable facts, we conclude that, given the totality of the circumstances, a reasonable and prudent officer in such a setting would have reasonably suspected that an occupant of the vehicle was in need of immediate help and that Trooper Buskirk's actual motivation for this contact was to ensure the immediate safety of Ms. Ullom. Trooper Buskirk's initiating reasons for his encounter with Ms. Ullom were, when viewed objectively, quite clearly a reasonable, independent and substantial justification for any intrusion he made into Ms. Ullom's privacy under the community caretaker doctrine. The record readily demonstrates that this intrusion was based on safety and welfare considerations, and was separate and apart from any police investigatory or arrest role. We therefore conclude that evidence related to Trooper Buskirk's initial encounter with Ms. Ullom was properly admissible pursuant herein to the "community caretaker doctrine" exception to the general warrant requirement of the Fourth Amendment and Article III, Section 6.

Once Trooper Buskirk was assured that Ms. Ullom was not in actual need of emergency aid, his caretaking duties were over and any further detention of Ms. Ullom by Trooper Buskirk would have constituted an unreasonable seizure *unless* Trooper Buskirk had a warrant or some other specific exception to the warrant requirement, such as an articulable, reasonable suspicion that Ms. Ullom had committed, was committing, or was about to commit criminal activity pursuant to *Terry* and *Stuart.* Here, we believe there is a sufficient objective basis to conclude that Trooper Buskirk's continued detention of Ms. Ullom, after his initial encounter with her under the community caretaker doctrine, was permissible under *Terry*

---

trine" all require a compelling and immediate need for the police to take swift action to prevent something adverse from occurring, they are separate doctrines. The exception for "exigent circumstances" applies when police are engaged in crime-solving activities, such as searching for evidence or suspects. Probable cause is necessary. The "emergency doctrine" and the "community caretaker doctrine" apply when police are not acting as crime-solvers, but rather are

acting in a health, safety and welfare role. The "emergency doctrine" contemplates the existence of an actual or reasonably perceived emergency. *See Cecil, supra.* The "community caretaker doctrine," focuses instead on whether, based upon the totality of circumstances, an experienced officer would suspect that a citizen is in need of help or is in peril such that immediate action by the officer is needed. *See Cady, infra.*

and *Stuart.* Trooper Buskirk testified that Ms. Ullom was behind the wheel of the vehicle with the keys in the ignition, there was a strong odor of alcohol, Ms. Ullom's eyes were glassy and bloodshot, she was speaking with slurred speech and her motor skills were unsteady. We therefore conclude that the remainder of Trooper Buskirk's seizure of Ms. Ullom was reasonable as a legitimate *Terry* and *Stuart* investigatory stop.

We find that the circuit court committed error when it reversed the order of the Commissioner suspending the driving privileges of Ms. Ullom on the basis that there was no probable cause for a warrantless seizure herein. Trooper Buskirk's encounter with Ms. Ullom came within permissible exceptions to the general warrant requirement of the Fourth Amendment and Article III, Section 6 pursuant to the community caretaker doctrine initially and thereafter pursuant to the exception recognized in *Terry* and *Stuart.*[11]

### B. The Circuit Court's Consideration of Appellee's Subsequent Acquittal

In his second assignment of error, the appellant argues that the circuit court improperly relied upon the appellee's subsequent acquittal on the related DUI charges in its decision reversing the revocation order of the Commissioner and thereby misapplied this Court's holding in *Choma v. West Virginia Division of Motor Vehicles,* 210 W.Va. 256, 557 S.E.2d 310 (2001). Specifically, appellant contends that it was improper of the circuit court to, in its review of the administrative proceeding, consider an acquittal

which had not yet occurred and which was not a part of the administrative record.

In *Choma,* we held:

"In administrative proceedings under W. Va.Code, 17C–5A–1 *et seq.,* the commissioner of motor vehicles must consider and give substantial weight to the results of related criminal proceedings involving the same person who is the subject of the administrative proceeding before the commissioner, when evidence of such results is presented in the administrative proceeding."

Syllabus Point 3, *Choma v. West Virginia Division of Motor Vehicles,* 210 W.Va. 256, 557 S.E.2d 310 (2001).[12] Quite obviously, *Choma* is immediately distinguishable here by the fact that in the present case, the acquittal of Ms. Ullom on criminal charges happened after the license revocation hearing and thus the information could not have been considered in the administrative proceeding.[13] Since the criminal case had yet to be resolved, there was nothing therein to which the Commissioner was required to give substantial weight. Accordingly, the circuit court erred in its ruling to the contrary.

### IV.

### CONCLUSION

For the foregoing reasons, we reverse the order of the Circuit Court of Marshall County, entered November 12, 2008, which reversed the commissioner's order of December 18, 2006, wherein the driving privileges of the appellee were revoked for a period of six months, and remand this matter to the Circuit Court for entry of an order affirming

---

**11.** " 'Where there is evidence reflecting that a driver was operating a motor vehicle upon a public street or highway, exhibited symptoms of intoxication, and had consumed alcoholic beverages, this is sufficient proof under a preponderance of the evidence standard to warrant the administrative revocation of his driver's license for driving under the influence of alcohol.' Syllabus Point 2, *Albrecht v. State,* 173 W.Va. 268, 314 S.E.2d 859 (1984)." Syllabus Point 2, *Carte v. Cline,* 200 W.Va. 162, 488 S.E.2d 437 (1997).

**12.** We observe that Syllabus Point 3 of *Choma* would appear to conflict with this Court's time-honored precedent stating "[i]t is the general rule that a judgment of acquittal in a criminal

action is not *res judicata* in a civil proceeding which involves the same facts." Syllabus, *Steele v. State Road Commission,* 116 W.Va. 227, 179 S.E. 810 (1935). In view of our disposition of this issue herein, we need not now consider the continued viability, if any, of Syllabus Point 3, of *Choma. See also Jordan v. Roberts,* 161 W.Va. 750, 246 S.E.2d 259 (1978).

**13.** At oral argument, counsel for the appellee conceded that because the acquittal happened after the hearing and decision in the administrative license revocation proceeding, the Commissioner could not have considered this evidence. We appreciate counsel's candor and acknowledge counsel's professionalism in this regard.

the underlying administrative order of suspension or revocation.

**Reversed and remanded.**