No. 11-1271        *State ex rel. William R. Adkins v. Dennis Dingus*

**FILED**

**November 21, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Davis, J., concurring:

In this appeal the majority opinion affirmed the circuit court's denial of Mr. Adkins' petition for habeas relief. I concur in the majority's decision to affirm the circuit court's order. However, I disagree with the manner in which the majority opinion resolved one of the issues in the case. The issue in question involved the seizure of ammunition from Mr. Adkins' residence. The majority opinion found that this evidence was lawfully seized. For the reasons set out below, I believe that the ammunition was unlawfully seized but that its introduction into evidence did not affect the outcome of the case; therefore, the error was harmless beyond a reasonable doubt.

### A. Seizure of the Ammunition was Unlawful

A central problem I have with the majority opinion's resolution of the issue involving seizure of the ammunition is its treatment of the doctrines that allow a search and seizure of contraband without a warrant. In my judgment, the majority opinion may have innocently brought about some confusion as to how the doctrines are triggered and satisfied. As I will demonstrate below, none of the following doctrines legitimized the seizure of the

1

ammunition: exigent circumstances, emergency doctrine, protective sweep, plain view doctrine and inevitable discovery rule.

*1. **Emergency Doctrine/Exigent Circumstances**.* Mr. Adkins argued that exigent circumstances did not exist to justify seizure of the ammunition. The majority opinion agreed with Mr. Adkins that the exigent circumstances did not justify seizure of the ammunition. I agree with the majority opinion on this point. However, I do not believe that the exigent circumstances doctrine was the doctrine that permitted Trooper Gunnoe to enter Mr. Adkins' home without a warrant. The precise doctrine that allowed Trooper Gunnoe to enter the home initially was the emergency doctrine. We have explained the emergency doctrine as follows:

> the emergency doctrine may be said to permit a limited, warrantless search or entry of an area by police officers where (1) there is an immediate need for their assistance in the protection of human life, (2) the search or entry by the officers is motivated by an emergency, rather than by an intent to arrest or secure evidence, and (3) there is a reasonable connection between the emergency and the area in question.

*State v. Cecil*, 173 W.Va. 27, 32, 311 S.E.2d 144, 149 (1983) (citation omitted). We further explained in *Cecil* that

> "the reasonableness of a warrantless search or entry under the emergency doctrine is established by the compelling need to render immediate assistance to the victim of a crime, or insure the safety of the occupants of a house when the police reasonably believe them to be in distress and in need of protection."

2

*Cecil*, 173 W. Va. at 32, 311 S.E.2d at 150 (internal quotations and citation omitted).[1]

Trooper Gunnoe testified that he entered the home because he received a police report that a shooting victim may have been in the home. Therefore it is clear that, because of the purpose for Trooper Gunnoe's entry into the home, the warrantless entry was permitted by the emergency doctrine.

Although the emergency doctrine allowed Trooper Gunnoe to enter the home, it did not provide him with authority to indiscriminately search the home. The emergency doctrine only allowed him to search the home for and seize a crime victim or victims. *See State v. Flippo*, 212 W. Va. 560, 570 n.8, 575 S.E.2d 170, 180 n.8 (2002) ("The scope of the search conducted by the police in this case, under the implied consent exception, was greater

---

[1]We have explained the difference between the emergency doctrine and exigent circumstances as follows:

> While the "emergency doctrine," [and] "exigent circumstances" . . . require a compelling and immediate need for the police to take swift action to prevent something adverse from occurring, they are separate doctrines. The exception for "exigent circumstances" applies when police are engaged in crime-solving activities, such as searching for evidence or suspects. Probable cause is necessary. The "emergency doctrine" . . . appl[ies] when police are not acting as crime-solvers, but rather are acting in a health, safety and welfare role. The "emergency doctrine" contemplates the existence of an actual or reasonably perceived emergency.

*Ullom v. Miller*, 227 W. Va. 1, 12 n.10, 705 S.E.2d 111, 122 n.10 (2010).

3

than what would be permitted under the emergency exception.").

*2. Protective Sweep*.  Once Trooper Gunnoe initially entered the home , he was authorized by the protective sweep doctrine to search for a possible attacker or weapon that could be used against him.  The protective sweep doctrine was first recognized by the United States Supreme Court in *Maryland v. Buie*, 494 U.S. 325, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990).

In *Buie*, the police entered the defendant's home to execute an arrest warrant. After the defendant was apprehended coming from the basement of the home, an officer entered the basement to search for anyone else who might have been in the basement.  In making this search, the officer saw and seized inculpatory evidence that was in plain view. The Supreme Court approved of the officer searching the basement for an attacker who could injure police officers present at the scene.  Consequently, the opinion in *Buie* held that during an arrest, the police may conduct a protective sweep of the premises if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Buie*, 494 U.S. at 334, 110 S. Ct. at 1098, 108 L.Ed. 2d 276.  The decision in *Buie* was careful to state that a protective sweep "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding."

4

*Buie*, 494 U.S. at 327, 110 S.Ct. at 1094, 108 L. Ed. 2d. 276..

Although *Buie* concerned a limited search for an attacker, this Court applied *Buie* to a search for weapons in *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996). We held in Syllabus point 8 of *Lacy* as follows:

> A protective search is defined as a quick and limited search of premises for weapons once an officer has individualized suspicion that a dangerous weapon is present and poses a threat to the well-being of himself and others. This cursory visual inspection is limited to the area where the suspected weapon could be contained and must end once the weapon is found and secured.

*Id.*

In the instant proceeding, the majority opinion recognized that Trooper Gunnoe could conduct a protective sweep to determine if an attacker was present. Trooper Gunnoe testified that he conducted a protective sweep and that during the sweep he saw the ammunition in plain view.

*3. Plain View Doctrine.* The majority opinion pointed out that the plain view doctrine allows the police to seize contraband when officers are lawfully present at the place where the contraband is observed. As noted by the majority opinion, we set out the elements of the plain view doctrine in Syllabus point 3 of *State v. Julius*, 185 W. Va. 422, 408 S.E.2d

5

1 (1991), as follows:

> The essential predicates of a plain view warrantless seizure are (1) that the officer did not violate the Fourth Amendment in arriving at the place from which the incriminating evidence could be viewed; (2) that the item was in plain view and its incriminating character was also immediately apparent; and (3) that not only was the officer lawfully located in a place from which the object could be plainly seen, but the officer also had a lawful right of access to the object itself.

Although Trooper Gunnoe testified that he saw the ammunition during the protective sweep, he did not seize the ammunition when he first observed it. The majority opinion indicates that the ammunition was seized without a warrant after Mr. Adkins' home had been secured and during a subsequent entry by Trooper Gunnoe. Even though the emergency that permitted Trooper Gunnoe to enter the home and terminated, the majority opinion found that seizure of the ammunition without a warrant was justified because "Trp. Gunnoe could have lawfully seized the ammunition during his protective sweep." Maj. Slip. Op at 19. I disagree.

It is clear and unquestioned that the point at which Trooper Gunnoe could lawfully seize the ammunition was during his protective sweep of the home. This situation is similar to an issue this Court confronted in *State v. Flippo*, 212 W. Va. 560, 575 S.E.2d 170.

In *Flippo*, the defendant was convicted of murdering his wife at a cabin retreat. During the initial police investigation into the murder, the defendant gave the police consent to search the cabin. During the period that the police had consent to search, they did not uncover photographs that were in a briefcase in the cabin. Instead, the photographs were seized later after the defendant's consent to search had been revoked. After the defendant was convicted, he argued on appeal that the photographs had been unlawfully seized and should not have been introduced into evidence. Even though the photographs were seized less than two hours after the defendant's consent to search was revoked, as determined by this Court on appeal, we found that the seizure was unlawful. In other words, the police could have seized the briefcase and photographs when they had consent to search, but once the basis for the search terminated, we held in *Flippo* that a warrant was needed to seize the briefcase and photographs. Ultimately, we held in *Flippo* that introduction of the photographs was harmless error.

In the instant proceeding the evidence is clear to me in showing that, at the point Trooper Gunnoe went back into the home with other police officers and the prosecutor and began a full scale search, a search warrant was required. The reason being that the justification for the initial entry and search had terminated. To get around this fact, the majority opinion has carved out a heretofore unknown exception to the warrant requirement, which permits the ammunition to be seized merely because it had previously been seen

7

during the period of the lawful entry.  This ad hoc exception appears to be a diluted version of the inevitable discovery rule.  However, the seizure of the ammunition does not satisfy the elements of the inevitable discovery rule.

In *Flippo*, we held that "[u]nder the inevitable discovery rule, unlawfully obtained evidence is not subject to the exclusionary rule if it is shown that the evidence would have been discovered pursuant to a properly executed search warrant."  Syl. pt. 3, *Flippo*, 212 W. Va. 560, 575 S.E.2d 170.  We set out the following in syllabus point 4 of *Flippo*:

> To prevail under the inevitable discovery exception to the exclusionary rule, Article III, Section 6 of the West Virginia Constitution requires the State to prove by a preponderance of the evidence: (1) that there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct; (2) that the leads making the discovery inevitable were possessed by the police at the time of the misconduct; and (3) that the police were actively pursuing a lawful alternative line of investigation to seize the evidence prior to the time of the misconduct.

*Id.*

Based upon the evidence submitted in this case, Trooper Gunnoe's seizure of the ammunition did not satisfy the third element of the inevitable discovery rule.  That is, there was no showing that the police were pursuing a lawful alternative to seize the evidence,

8

*i.e.*, seeking a search warrant.[2]  As we noted in *Flippo*, "[i]f police are allowed to search when they possess no lawful means and are only required to show that lawful means could have been available even though not pursued, the narrow 'inevitable discovery' exception would 'swallow' the [constitutional warrant] protection." *Flippo*, 212 W. Va. at 580, 575 S.E.2d at 190 (internal quotations and citation omitted).

## *B.  Harmless Error*

Even though I believe the seizure of the ammunition was unlawful, I also believe the introduction of this evidence at trial was harmless error.  This Court has observed on numerous occasions that "[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt."  Syl. pt. 5, *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975).  *See also* Syl. pt. 14, *State v. Salmons*, 203 W. Va. 561, 509 S.E.2d 842 (1998).  Moreover, "'[e]rrors involving deprivation of constitutional rights will be regarded as harmless only if there is no reasonable possibility that the violation contributed to the conviction.'" *State v. Jenkins*, 195 W. Va. 620, 629, 466 S.E.2d 471, 480 (1995) (quoting, Syl. pt. 20, *State v. Thomas*, 157 W. Va. 640, 203 S.E.2d 445 (1974)).

---

[2]The police may in fact have been seeking a search warrant, but the record on appeal is apparently silent on the issue.

Mr. Adkins' contends in his brief that introduction of the ammunition was not harmless because it was used to establish premeditation and deliberation. This argument is not supported by the facts. It is clear that the question of who killed the victim was not in dispute. Mr. Adkins admitted that he shot the victim. Mr. Adkins put on evidence to suggest that the shooting was in self-defense. The jury rejected this defense. More importantly, insofar as Mr. Adkins admitted to shooting the victim, showing the jury that extra unused ammunition was found in the home was not relevant to any issue in the case. We have emphasized that a party advancing a claim of ineffective assistance of counsel "must prove there is a 'reasonable probability' that, absent the errors, the jury would have reached a different result." *State v. Miller*, 194 W. Va. 3, 15, 459 S.E.2d 114, 126 (1995). I cannot discern a reasonable possibility that the admission of evidence of the ammunition affected the jury's conclusion.

For these reasons, I concur in the decision reached in this case.