639 S.E.2d 778

**STATE of West Virginia, Plaintiff Below, Appellee**

v.

**Michael Lee KENDALL, Defendant Below, Appellant.**

No. 32689.

Supreme Court of Appeals of West Virginia.

Submitted: Oct. 25, 2006.

Decided: Nov. 29, 2006.

Dissenting Opinion of Justice Starcher Dec. 12, 2006.

---

688

Darrell V. McGraw, Jr., Attorney General, Barbara Allen, Managing Deputy Attorney General, Colleen A. Ford, Assistant Attorney General, Charleston, for the Appellee.

Jerald E. Jones, West & Jones, Clarksburg, for the Appellant.

PER CURIAM.

This is an appeal by Michael Kendall (hereinafter "Appellant") from an order of the Circuit Court of Gilmer County sentencing the Appellant to twenty days in jail and five years of probation based upon a jury conviction of burglary and three counts of brandishing. The Appellant challenges his conviction, asserting several assignments of error on appeal. Based upon thorough review of the record, briefs, arguments of counsel, and applicable precedent, this Court reverses the lower court and remands this matter for a new trial.

I. Factual and Procedural History

The Appellant, while employed as a police officer for the City of Glenville, was called to a local bar to investigate an alleged fight shortly after midnight on March 7, 2003. Mr. Jacob Dennison, an off-duty Weston, West Virginia, police officer, accompanied the Appellant on the call. Although the fight had ended by the time the Appellant and Mr. Dennison arrived at the scene, they remained in the parking lot and thereafter observed Mr. Kevin Tingler in what they believed to be an intoxicated state. The Appellant informed Mr. Tingler that he should not attempt to operate a motor vehicle.

A few hours later, at approximately 2:40 a.m., the Appellant observed Mr. Tingler driving his truck and began pursuing him in the police cruiser. The Appellant attempted to stop Mr. Tingler by using his emergency lights and siren. Mr. Tingler fled in his vehicle, and the Appellant pursued him for several miles through Gilmer County. Mr. Tingler eventually lost control of his vehicle and drove off the road. According to the testimony of the Appellant, the Appellant pulled his vehicle into a yard in an attempt to block Mr. Tingler's vehicle, got out of his police cruiser with his service pistol drawn, and requested that Mr. Tingler exit his vehicle.[1] According to the Appellant, Mr. Tingler then drove his vehicle toward the Appellant, and the Appellant fired his pistol at Mr. Tingler's vehicle. Mr. Tingler thereafter drove away in his vehicle.

Approximately one hour later, at 4:00 a.m., the Appellant and Mr. Dennison arrived at Mr. Tingler's home.[2] According to the Appellant's testimony, lights in the home had been illuminated when he and Mr. Dennison first arrived but were turned off as the occupants became aware of the officers' presence. The Appellant saw a vehicle parked in the

---

1. The State asserts that the Appellant actually hit Mr. Tingler's vehicle with the police cruiser.

2. The home was apparently owned by Erlin Tingler, the father of Kevin Tingler.

driveway and learned that it was registered to Mr. Tingler. The Appellant also observed muddy tire tracks going from the driveway to the rear of the home.

With his pistol drawn, the Appellant knocked on the door of the home. He testified that the door was open and that he tapped the door twice with his foot, announcing that he was a police officer. There is an evidentiary dispute regarding whether someone opened the door, the Appellant kicked it, or it swung open on its own when the Appellant knocked.[3] Although Kevin Tingler was not in the room, four other people were sitting in the room.[4] Mr. Larry Snider, one of the occupants of the room, testified that the Appellant was polite and requested permission to search the home. Mr. Snider also testified that Erlin Tingler gave the Appellant permission to search the home. The Appellant conducted a search of the home for Mr. Tingler but was unable to locate him. Mr. Tingler reported to the Gilmer County Sheriff's Department the following day.

The Appellant was thereafter indicted for attempted voluntary manslaughter, destruction of property, three counts of kidnapping, three counts of wanton endangerment, and burglary. The three counts of kidnapping were dismissed before the Appellant began his case-in-chief on the last day of trial. During the January and February 2004 trial, Mr. Dennison invoked the Fifth Amendment and did not testify.[5] The Appellant was convicted of burglary and three counts of brandishing, as the lesser included offense of the charged wanton endangerment. He was sentenced to twenty days in jail and five years probation. The sentence was stayed pending this appeal.

On appeal, the Appellant contends that the lower court erred by providing the jury with an "entry of premises" instruction informing the jury that neither exigent circumstances nor hot pursuit existed in this case and by failing to provide the jury with an instruction offered by the Appellant. The Appellant further contends that the prosecution inappropriately influenced Mr. Dennison's decision to invoke the Fifth Amendment and that the Appellant should not have been convicted of three counts of brandishing where only one act of brandishing was proven.

## II. Standard of Review

■ This Court is presented with several assignments of error, each subject to a separate standard of review. Regarding the alleged instructional errors, this Court is guided by the standards of review articulated in syllabus point four of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), explaining as follows:

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

■ Regarding the Appellant's assignment of error on the issue of prosecutorial misconduct, this Court adheres to the principles announced in syllabus point three of

---

**3.** Some of the occupants of the room testified that the Appellant kicked open the door. However, an examination of the door by the Gilmer County Sheriff's Department did not reveal any damage to the door or latch.

**4.** The four individuals in the room when the Appellant entered were Chad Tingler (Kevin Tingler's brother), Larry (Mike) Snider, Kevin Thompson, and Jeff Mahalich. Erlin Tingler was apparently in bed sleeping when the Appellant first arrived and later awakened and talked with the Appellant. Chad Tingler testified that he and his friends had gathered in the living room and were getting ready to awaken Erlin Tingler when the Appellant arrived.

**5.** Despite Mr. Dennison's decision not to testify, the defense was permitted to utilize a statement Mr. Dennison had made to the Sheriff's Department regarding the events in question. Mr. Dennison has not been charged with any offense.

*State v. Boyd,* 160 W.Va. 234, 233 S.E.2d 710 (1977), providing as follows:

> The prosecuting attorney occupies a quasi-judicial position in the trial of a criminal case. In keeping with this position, he is required to avoid the role of a partisan, eager to convict, and must deal fairly with the accused as well as the other participants in the trial. It is the prosecutor's duty to set a tone of fairness and impartiality, and while he may and should vigorously pursue the State's case, in so doing he must not abandon the quasi-judicial role with which he is cloaked under the law.

Syllabus point six of *State v. Sugg,* 193 W.Va. 388, 456 S.E.2d 469 (1995), also provides as follows:

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

The Appellant also asserts that the lower court erred in permitting conviction for three separate counts of brandishing where only one act of brandishing was proven. That issue presents a question of law which this Court reviews *de novo.*

With those standards of review as guidance, we consider the allegations of the Appellant.

### III. Discussion

#### A. Alleged Exigent Circumstances Instructional Error

██ The Appellant contends that the lower court erred by providing the jury with an instruction regarding the entry of the premises which directed a verdict against the Appellant by informing the jury that neither exigent circumstances nor hot pursuit existed when the Appellant entered the Tingler home. That instruction specifically provided as follows:

> Absent exigent circumstances, hot pursuit of [or] consent to enter the premises, a law enforcement officer does not have the authority to enter into a private residence unless the law enforcement officer has a search warrant to enter the premises.

> The Court further instructs the jury that exigent circumstances and hot pursuit did not exist under the facts of this case, that would have authorized Michael Kendall to enter the residence of Erlin Tingler.

According to the assertions of the Appellant, the lower court compounded this instructional error by failing to provide the jury with the Appellant's offered instruction regarding the right to enter a home and make a warrantless search subsequent to the commission of a felony in an officer's presence.[6]

In discussion of these instructional assignments of error on appeal, the State empha-

---

6. The instruction offered by the Appellant and refused by the lower court would have instructed the jury as follows:

> The Court instructs the jury that a police officer may always make a warrantless arrest for a felony committed in his presence. However, a warrantless arrest in the home must be justified not only by probable cause, but by exigent circumstances which make an immediate arrest imperative.

> You are further instructed that the tests of exigent circumstances for the making of an arrest for a felony without a warrant in West Virginia is whether, under the totality of circumstances, the police had reasonable grounds to believe that if an immediate arrest was not made, the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to obtain a

warrant endanger the safety or property of others.

> Therefore, if you believe from the evidence in this case that Kevin Tingler had committed the felony of fleeing from a police officer in a motor vehicle while under the influence of alcohol or other felony by striking a police officer with his motor vehicle in an attempt to escape arrest, and you further believe from the evidence that Michael Kendall had reasonable cause to believe that Kevin Tingler may be hiding in the home of his father Erlin Tingler and if you further believe that exigent circumstances existed which justified Michael Kendall in making a warrantless arrest, then he had the right to enter the home of Erlin Tingler to conduct a search for Kevin Tingler and to inquire of the occupants of the home if they knew of Kevin Tingler's whereabouts.

sizes that the lower court's instructions were correct and that this Court has consistently held that a warrantless arrest must be justified by probable cause and exigent circumstances, as discussed below. Furthermore, the State asserts that the refused instruction, as offered by the Appellant, was unnecessary and would have been contradictory to the court's chosen instruction.

This Court's examination of the appropriateness of the lower court's instructions must commence with an analysis of the principle of exigent circumstances. The Fourth Amendment protects individuals in their homes against unreasonable searches and seizures. *See State v. Poling*, 207 W.Va. 299, 303, 531 S.E.2d 678, 682 (2000). In syllabus point twenty of *State v. Ladd*, 210 W.Va. 413, 557 S.E.2d 820 (2001), this Court explained as follows:

> "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment and Article III, Section 6 of the West Virginia Constitution—subject only to a few specifically established and well-delineated exceptions. The exceptions are jealously and carefully drawn, and there must be a showing by those who seek exemption that the exigencies of the situation made that course imperative." Syllabus Point 1, *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980), *overruled in part on other grounds by State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991).

Thus, a warrantless entry into a home is not permitted under the Fourth Amendment unless certain specified situations exist. In *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996), this Court addressed the exigent circumstances which might justify a warrantless search and explained as follows:

> The test for the existence of exigent circumstances is whether the facts would lead a reasonable, experienced police officer to believe the evidence might be destroyed or removed before a warrant could be secured. There must be evidence both that an officer was "actually ... motivated

by a perceived need to render aid or assistance" and "that a reasonable person under the circumstances must have thought that an emergency existed." *State v. Cecil*, 173 W.Va. 27, 32 n. 10, 311 S.E.2d 144, 150 n. 10 (1983).

196 W.Va. at 112 n. 7, 468 S.E.2d at 727 n. 7. "Recognized situations in which exigent circumstances exist include: danger of flight or escape; danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and hot pursuit of a fleeing suspect." *Id.*, 468 S.E.2d at 727 n. 7.[7]

In *State v. Buzzard*, 194 W.Va. 544, 461 S.E.2d 50 (1995), this Court stated: "Exigent circumstances exist where there is a compelling need for the official action and there is insufficient time to secure a warrant, police may then enter and search private premises ... without obtaining a warrant." 194 W.Va. at 549 n. 11, 461 S.E.2d at 55 n. 11. The *Buzzard* Court also explained:

> Exigent circumstances may exist in many situations: three well recognized situations are when police reasonably believe (1) their safety or the safety of others may be threatened, (2) quick action is necessary to prevent the destruction of potential evidence, or (3) immediate action is necessary to prevent the suspect from fleeing.

*Id.*, 461 S.E.2d at 55 n. 11.

As this Court explained in syllabus point two of *State v. Mullins*, 177 W.Va. 531, 355 S.E.2d 24 (1987), "[a] warrantless arrest in the home must be justified not only by probable cause, but by exigent circumstances which make an immediate arrest imperative." *See also State v. Davisson* 209 W.Va. 303, 308, 547 S.E.2d 241, 246 (2001). Syllabus point three of *Mullins* explains the circumstances under which exigent circumstances exist for an arrest for a felony by stating:

> "The test of exigent circumstances for the making of an arrest for a felony without a warrant in West Virginia is whether, under the totality of the circumstances, the police had reasonable grounds to believe that if an immediate arrest were not made,

---

7. For example, in *Cecil*, this Court upheld the search of a mobile home under exigent circumstances where the police had legitimate reason to believe that an injured or deceased child might be in the mobile home. 173 W.Va. at 34, 311 S.E.2d at 151.

the accused would be able to destroy evidence, flee or otherwise avoid capture, or might, during the time necessary to procure a warrant, endanger the safety or property of others. This is an objective test based on what a reasonable, well-trained police officer would believe." Syl. Pt. 2, *State v. Canby,* 162 W.Va. 666, 252 S.E.2d 164 (1979).

In *State v. Cheek,* 199 W.Va. 21, 483 S.E.2d 21 (1996), police officers suspected that the defendant had been driving under the influence. They therefore proceeded to his home, detected the odor of alcohol, and executed a warrantless arrest after pulling him from his house into the front yard. This Court found that the arrest was illegal, explaining as follows:

> Although the State maintains that the metabolism of alcohol created an exigent circumstance, the officers did not have reasonable grounds based on their investigation before the arrest to use the metabolism of alcohol as an exigent circumstance. Because Mr. Cheek was in his home, he was not liable to flee, destroy

evidence or endanger the safety or property of others; especially with the two officers outside. Finally, we note that although the responding officers were on foot patrol, by the time Mr. Cheek was arrested, a third officer in a cruiser was present. Given the communications which must have occurred to bring the additional officer to the scene, the responding officers could have obtained an arrest warrant and probably would have if probable cause existed at that time to arrest Mr. Cheek for driving under the influence.

199 W.Va. at 26–27, 483 S.E.2d at 26–27.

In the case sub judice, the Appellant asserts that the lower court abused its discretion by deciding the question of whether exigent circumstances existed, by removing that factual decision from the jury, and by explicitly instructing the jury that neither exigent circumstances nor hot pursuit existed. Courts addressing the issue of the proper entity to decide the question of exigent circumstances have recognized that the issue involves a mixed question of law and fact.[8] *United States v. Russell,* 436 F.3d 1086, 1089

---

**8.** The distinguishing characteristics among questions of law, questions of fact, and mixed questions of law and fact are uniquely examined by the authors of a monograph developed for the Federal Judicial Center entitled *The Analysis and Decision of Summary Judgment Motions,* as extensively quoted in Justice Albright's dissent in *Merrill v. West Virginia Dept. of Health and Human Resources,* 219 W.Va. 151, 632 S.E.2d 307 (2006). The authors of that writing conclude that where resolution of ultimate facts turns on the assessment of human behavior and expectations, the matter is generally for jury determination. The authors explain as follows:

> When the application of a rule of law depends on the resolution of disputed historical facts, however, it becomes a mixed question of law and fact. Plaintiff's standing to sue, for example, may turn on activities of the plaintiff that are in dispute. Whether the statute of limitations has run may depend on a dispute over when plaintiff received notice. Such disputed facts normally preclude summary judgment.
>
> Mixed questions of law and fact arise in a variety of other forms. Normally, the legal questions presented are resolved by the court and the fact issues by the jury. Contract disputes, though frequently questions of law, may present mixed questions; when the court determines that a document is ambiguous, for example, the jury resolves evidentiary disputes such as what the parties intended. Constitutional issues, though generally questions of

law, may be mixed questions when they turn on factual determinations.

> Although the terms are sometimes used interchangeably, it is useful to distinguish mixed questions of law and fact from questions of ultimate fact. Mixed questions generally require the resolution of disputes over historical fact. Ultimate facts present a different kind of "factual" inquiry, one involving a process that "implies the application of standards of law." [*Baumgartner v. U.S.,* 322 U.S. 665, 671, 64 S.Ct. 1240, 88 L.Ed. 1525 (1944).] Like some historical facts, ultimate facts are derived by reasoning or inference from evidence, but, like issues of law, they incorporate legal principles or policies that give them independent legal significance. They often involve the characterization of historical facts, and their resolution is generally outcome-determinative.

> Ultimate facts occupy a broad segment of the spectrum between fact and law. Where on that spectrum a particular ultimate fact belongs depends on whether it is predominantly factual or legal. For example, whether a defendant used due care in the operation of a vehicle or was driving in the course of employment or whether that person's acts were the proximate cause of plaintiff's injuries are all questions of ultimate fact that are predominantly factual rather than legal and therefore clearly for the jury. Similarly, whether a person had reasonable cause, acted within a reasonable time, or can be charged with notice are predominantly factual (though outcome-

n. 2 (9th Cir.2006); *United States v. Bynum,* 362 F.3d 574, 578–79 (9th Cir.2004); *United States v. Zermeno,* 66 F.3d 1058, 1063, n. 2 (9th Cir.1995). Other courts have expressly stated that the "presence of exigent circumstances is a question of fact within the province of the Jury...." *Richmond v. City of Brooklyn Center,* 2005 WL 1843332, *8 (D.Minn.2005); *see also Ewolski v. City of Brunswick,* 287 F.3d 492, 501 (6th Cir.2002) (holding that the determination of exigent circumstances is "normally a question for the jury....").

In *Lassiter v. City of Bremerton,* 2006 WL 2597999 (W.D.Wash.2006), the United States District Court for the Western District of Washington explained the "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." 2006 WL 2597999 at *2 (citing *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). The court then explained that "[t]he presence of exigent circumstances, however, provides a narrow exception to the warrant requirement." *Id.* "Whether Defendants can establish exigent circumstances is a disputed question of fact for the jury to decide." *Id.* at *3.

This is particularly true where disputed questions exist regarding such issues as the facts precipitating the search, the considerations within the understanding of the officers conducting the search, and whether the search was conducted with or without consent. The United States District Court for the Middle District of Florida addressed these concerns in *Ripley v. City of Lake City*

*Florida,* 2006 WL 2194594 (M.D.Fla.2006) and queried whether "exigent circumstances [were] present as to justify the search if no consent was made. If exigencies were present, were they enough to compel an exception to the warrantless entry into Mr. Ripley's home? The Court believes that this is a question for the jury." 2006 WL 2194594 at *3.

In the present case, this Court concludes that the lower court should have permitted the issue of exigent circumstances to be decided by a jury. There were several elements of relevant disputed testimony which would bear upon the decision. For instance, the Appellant testified that the door was ajar when he arrived at the home. Testimony by the Appellant and Mr. Snider[9] also indicated that the Appellant actually received consent to search the Tingler home. Additional testimony by the Appellant indicated that he believed that Mr. Tingler might flee, be injured, or present a danger to the safety of the police officers or other individuals. While this Court is cognizant that not all assertions of exigent circumstances provide legal justification for warrantless entry, the circumstances of this case present a situation in which the legitimacy of the Appellant's concerns and the disputed facts underlying such concerns create a question of fact for jury resolution. We consequently reverse the Appellant's conviction on this ground and remand for a new trial consistent with this opinion.

### B. Alleged Prosecutorial Misconduct

■ The Appellant also includes an assignment of error alleging prosecutorial mis-

---

determinative) questions. The resolution of such questions turns on an assessment of human behavior and expectations within the common experience of jurors. Concerning issues of this sort, traditionally resolved by juries, the Supreme Court [in *Railroad Co. v. Stout,* 17 Wall. 657, 84 U.S. 657, 664, 21 L.Ed. 745,] said in 1873: "It is assumed that twelve men know more of the common affairs of life than does one man, that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge."

Near the opposite end of the spectrum lie those ultimate facts that, though nominally facts, have a high law content. Their resolution (in the absence of evidentiary disputes) turns on matters of law and policy and on technical issues underlying the legal scheme. The administration of the rules under which

they arise benefits from consistency, uniformity, and predictability. Whether an instrument is a security, whether a plaintiff is a public figure, whether a publication is not copyrightable as historical, whether an invention was reduced to practice, and whether a carrier operated as a common carrier are questions of ultimate fact calling for the interpretation and application of essentially legal standards.

Schwarzer, Hirsch & Barrans, *The Analysis and Decision of Summary Judgment Motions,* 139 F.R.D. 441, 456–57 (1992) (footnotes omitted).

9. Mr. Snider testified that he had gone around the corner of the living room into the kitchen but that the Appellant "came in, shook my hand, told me that Kevin was in some trouble and he asked for permission to search the house and Erlin gave him the permission...."

conduct regarding the decision of Mr. Dennison to invoke the Fifth Amendment and not testify. The Appellant contends that the prosecution silenced Mr. Dennison by threatening him with prosecution and by failing to offer him immunity. The State responds to that allegation by stating that it did not threaten Mr. Dennison in any manner and that it was not required to offer immunity for Mr. Dennison's testimony. In essence, the State contends that Mr. Dennison's decision not to testify was not influenced by the action of the State.

Based upon our review of the record, we find no evidence that the State prevented Mr. Dennison from testifying or in any significant manner influenced his decision to invoke that Fifth Amendment. In fact, Mr. Dennison's statement was utilized at trial.[10] The State did not intimidate Mr. Dennison in any perceivable manner, and there is no suggestion that Mr. Dennison was coerced into asserting the privilege. We therefore agree with the contention of the State on this issue and find no merit to the Appellant's allegation of prosecutorial misconduct. Where considering such a claim, other courts have generally concluded that absent egregious prosecutorial misbehavior, the practice of denying defense witness immunity does not violate a defendant's constitutional rights. See, e.g., United States v. Turkish, 623 F.2d 769, 772–75 (2d Cir.1980), cert. denied, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981); United States v. Klauber, 611 F.2d

512, 517 n. 10 (4th Cir.1979), cert. denied, 446 U.S. 908, 100 S.Ct. 1835, 64 L.Ed.2d 261 (1980).

### C. Conviction of Three Counts of Brandishing

The Appellant was charged with three separate counts of wanton endangerment. The jury convicted him of three counts of the lesser included offense of brandishing.[11] On appeal, the Appellant contends that three separate counts are not justified by the evidence since there was only one act of brandishing by the Appellant, an act which happened to be witnessed by several people.

The Appellant did not object to the three separate counts at trial and has raised this issue for the first time on appeal. However, since this Court has reversed this case on the instructional error and is remanding for a new trial, we cannot overlook the possibility of error on retrial. Double jeopardy principles prohibit the State from retrying [12] the Appellant on the wanton endangerment charges; thus, it will be necessary for the lower court to readdress this brandishing issue during the new trial.

In a factually comparable case, the California Court of Appeals addressed the issue of the number of counts of brandishing which are appropriately charged in a given situation. In In re Peter F., 132 Cal.App.4th 877, 34 Cal.Rptr.3d 52 (2005), the court held that a single act of brandishing a deadly weapon in the presence of others, even where witnessed by more than one person, could support only one conviction.[13] The court reasoned as follows:

> that "well established double jeopardy principles ... preclude a higher conviction on retrial where the defendant has been implicitly acquitted of such higher offense by his conviction of a lesser included offense at the original trial." 173 W.Va. at 454, 317 S.E.2d at 813.

**10.** The Appellant contends that the statement was insufficient and that Mr. Dennison's testimony would have provided additional benefit to the Appellant's development of a defense at trial.

**11.** West Virginia Code § 61–7–11 (1994) (Repl. Vol.2005), provides as follows:

It shall be unlawful for any person armed with a firearm or other deadly weapon, whether licensed to carry the same or not, to carry, brandish or use such weapon in a way or manner to cause, or threaten, a breach of the peace. Any person violating this section shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined not less than fifty nor more than one thousand dollars, or shall be confined in the county jail not less than ninety days nor more than one year, or both.

**12.** This Court noted in State ex rel. Young v. Morgan, 173 W.Va. 452, 317 S.E.2d 812 (1984),

**13.** The relevant California statute, Penal Code section 417, subdivision (a)(1), provided in pertinent part as follows:

Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty of a misdemeanor, punishable by imprisonment in a county jail for not less than 30 days.

At two separate times, Peter waved a knife and/or a box cutter in a threatening manner. Each time, two people were present.

We conclude, and the Attorney General agrees, Peter could properly be charged with only one count of brandishing a deadly weapon in connection with each separate incident, for a total of two counts, no matter how many individuals were present and witnessed his actions. Therefore, we remand the case to the juvenile court to strike two of the four counts of brandishing a deadly weapon....

132 Cal.App.4th 877, 34 Cal.Rptr.3d 52, 53. Thus, the matter was remanded to the trial court with directions to strike two of the four counts of brandishing to the extent that the defendant should be convicted of only one count for each separate incident. *Id.*

 Similarly, in the present case, the State's evidence indicated only one act of brandishing a weapon. Despite the presence of multiple witnesses, one act of brandishing should produce a conviction for only one count of brandishing. There did not appear to be any evidence of multiple acts of brandishing or specific instances of threats against separate individuals. These issues may be readdressed during the new trial.

### IV. Conclusion

Based upon the foregoing, this Court reverses the Appellant's conviction and remands this case for a new trial consistent with this opinion.

Reversed and remanded with directions.

STARCHER, J., dissenting.

(Filed Dec. 12, 2006)

The evidence in the record rather clearly demonstrates that the appellant, Michael Lee Kendall, was a "rogue cop" who repeatedly violated both the law and applicable police procedure.

For reasons that are nowhere apparent, the majority opinion repeatedly recites factual assertions by Mr. Kendall that were controverted by the State—and were disbelieved by the jury. In other words, the majority opinion contradicts a fundamental appellate rule—we assume that the facts are in accord with the jury's verdict. *See State v. Easton,*

203 W.Va. 631, 638, 510 S.E.2d 465, 472 (1998).

Properly looking at the factual record, the evidence in this case showed an officer who initiated a dangerous high-speed chase, then rammed and shot point-blank into a vehicle—and then *lied* about why he did so. (Forensic evidence contradicted the officer's story that the fleeing suspect tried to strike the officer.)

Then, hours later, the officer broke into a house with his gun drawn, without a warrant or backup, and out of his jurisdiction. This was, of course, the house where the fugitive turned out *not* to be.

At every step, the officer violated proper police procedure, endangering himself, fellow officers, and innocent people.

On the issue of exigent circumstances, the majority fails to mention that Mr. Kendall first radioed to his headquarters that he had *broken off pursuit*—and then Mr. Kendall *broke into* the house with his weapon drawn. As a matter of law, once Mr. Kendall had officially broken off pursuit, and with no legal authority to be on a frolic of his own, there were no "exigent circumstances," and the trial judge so properly ruled.

It is a rare day when a police officer engages in such egregious misconduct that a prosecuting attorney brings charges. And it is even rarer that a jury disbelieves the officer's story, and convicts him. The majority opinion is a slap in the face of a courageous trial judge who made proper rulings on the law and an equally courageous jury who did the right thing to protect society against official lawlessness.

Accordingly, I dissent.