IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2013 Term

_____

No. 11-1271

_____

FILED

**November 21, 2013**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA EX REL. WILLIAM R. ADKINS,
Petitioner Below, Petitioner

v.

DENNIS DINGUS, Warden, McDowell County Correctional Center,
Respondent Below, Respondent

_____

Appeal from the Circuit Court of Logan County
The Honorable Eric H. O'Briant, Judge
Civil Action No. 01-C-323-O

AFFIRMED

_____

Submitted: October 16, 2013
Filed: November 21, 2013

Matthew Brummond, Esq.                     Patrick Morrisey, Esq.
Assistant Public Defender                   Attorney General
Charleston, West Virginia                   Christopher Dodrill, Esq.
Counsel for the Petitioner                  Assistant Attorney General
                                            Charleston, West Virginia
                                            Counsel for the Respondent

The Opinion of the Court was delivered PER CURIAM.

JUSTICE DAVIS concurs and reserves the right to file a concurring opinion.

SYLLABUS BY THE COURT

1.      "'An ineffective assistance of counsel claim presents a mixed question of law and fact; we review the circuit court's findings of historical fact for clear error and its legal conclusions *de novo*. This means that we review the ultimate legal claim of ineffective assistance of counsel *de novo* and the circuit court's findings of underlying predicate facts more deferentially.' *State ex rel. Daniel v. Legursky*, 195 W.Va. 314, 320, 465 S.E.2d 416, 422 (1995)." Syl. pt. 1, *State ex rel. Vernatter v. Warden*, 207 W. Va. 11, 528 S.E.2d 207 (1999).

2.      "In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Syl. pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

3.      "In reviewing counsel's performance, courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's

i

strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue." Syl. pt. 6, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

4. "'A man attacked in his own home by an intruder may invoke the law of self-defense without retreating.' Syllabus point 4, *State v. Preece*, 166 W. Va. 176, 179 S.E. 524 (1935)." Syl. pt. 1, *State v. W.J.B.*, 166 W. Va. 602, 276 S.E.2d 550 (1981).

5. "The occupant of a dwelling is not limited in using deadly force against an unlawful intruder to the situation where the occupant is threatened with serious bodily injury or death, but he may use deadly force if the unlawful intruder threatens imminent physical violence or the commission of a felony and the occupant reasonably believes deadly force is necessary." Syl. pt. 2, *State v. W.J.B.*, 166 W. Va. 602, 276 S.E.2d 550 (1981).

6. "The amount of force that can be used in self-defense is that normally one can return deadly force only if he reasonably believes that the assailant is about to inflict death or serious bodily harm; otherwise, where he is threatened only with non-deadly force, he may use only non-deadly force in return." Syl. pt. 1, *State v. Baker*, 177 W. Va. 769, 356 S.E.2d 862 (1987).

7.      "The essential predicates of a plain view warrantless seizure are (1) that the officer did not violate the Fourth Amendment in arriving at the place from which the incriminating evidence could be viewed; (2) that the item was in plain view and its incriminating character was also immediately apparent; and (3) that not only was the officer lawfully located in a place from which the object could be plainly seen, but the officer also had a lawful right of access to the object itself." Syl. pt. 3, *State v. Julius*, 185 W. Va. 422, 408 S.E.2d 1 (1991).

Per Curiam:

This case is before the Court on appeal by the petitioner, William Adkins, of the Circuit Court of Logan County's August 9, 2011, order denying the petitioner's request for habeas corpus relief. The petitioner is currently serving a sentence on a first degree murder conviction at the McDowell County Correctional Center. In this appeal, the petitioner alleges that both his trial counsel and his appellate counsel were ineffective and that he is entitled to habeas corpus relief. He claims that the circuit court erred in denying the requested relief. The respondent, Warden Dennis Dingus,[1] asserts that no error was committed below.

After a thorough review of the record presented for consideration, the briefs, the legal authorities cited, and the arguments of the petitioner and the respondent, we find that the circuit court did not err in denying the petitioner's requested habeas corpus relief. Therefore, we affirm the circuit court's order.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

The petitioner, William "Bill" Adkins, shot and killed his ex-girlfriend's adult son, 27-year-old Shawn Dingess ("the victim"), on September 3, 1999. The

---

[1] While this case was pending before the Court, Dennis Dingus replaced Michael Coleman as warden in this case. Pursuant to Rule 41(c) of the West Virginia Rules of Appellate Procedure, the name of the current public officer has been substituted accordingly in this action.

shooting took place in the petitioner's home. According to the petitioner, he had arrived home to find the victim in the house, but he did not know how the victim got in.[2] The victim demanded money from the petitioner, claiming that he intended to use the money to repay a debt owed by the petitioner to the victim's mother. The petitioner refused to pay, claiming that he did not owe his ex-girlfriend any money, and asked the victim to leave. The victim did not leave. Instead, both men sat in the living room together for a couple of hours drinking beer.

Sometime while the men were in the living room together, the petitioner noticed that the victim had a gun. When the victim left the room to obtain more beer, the petitioner claims he retrieved his own gun and hid it under a cushion on the couch. The petitioner asserted at trial that sometime after the victim returned to the living room, the victim again requested money and became violent, threatening the petitioner with his gun. In response, the petitioner used the gun he had hidden under the couch cushion, shooting and killing the victim. After the shooting, the petitioner walked to his parents' house nearby. The petitioner did not report the shooting to the police. The victim's body was discovered later that day by friends who had arrived at the house to pick up the victim. The petitioner was arrested at his parents' home shortly thereafter.

---

[2] The petitioner testified at trial that he and the victim had previously lived in the home together.

2

Medical and forensic evidence showed that the victim was shot five times. Two of the three shots to the victim's back were taken at close range, within six inches. The victim also suffered injuries to his head, including sixteen abrasions and a fractured skull. Blood was found on the petitioner's clothes and inside the barrel of his gun. At trial, the petitioner testified that all of his shots were taken from a distance no closer than four feet. He claimed he did not beat the victim in the head at any point and could not explain how the victim's blood got on his pants or inside his gun.

The petitioner's three-day trial took place between March 20, 2000, and March 22, 2000. At the conclusion of the trial, the jury found that the petitioner was guilty of first degree murder, but it recommended mercy. Petitioner appealed his conviction on November 27, 2000 to this Court. The Court entered an order on January 24, 2001, refusing the request to hear the appeal.

The petitioner filed his petition for habeas corpus *pro se* on October 17, 2001. Thereafter counsel was appointed to him, and a number of amended habeas filings were made over a span of years. After a series of status hearings, the circuit court held an omnibus hearing to address the petitioner's habeas corpus petition on December 3, 2010. By order dated August 9, 2011, the circuit court denied the requested habeas relief. The petitioner now appeals to this Court, raising only two of the twenty-eight errors he argued before the circuit court.

## II.

## STANDARD OF REVIEW

Both of the petitioner's assignments of error involve claims of ineffective assistance of counsel. This Court reviews claims of ineffective assistance of counsel pursuant to syllabus point 1 of *State ex rel. Vernatter v. Warden*, 207 W. Va. 11, 528 S.E.2d 207 (1999):

> "An ineffective assistance of counsel claim presents a mixed question of law and fact; we review the circuit court's findings of historical fact for clear error and its legal conclusions de novo. This means that we review the ultimate legal claim of ineffective assistance of counsel de novo and the circuit court's findings of underlying predicate facts more deferentially." *State ex rel. Daniel v. Legursky*, 195 W.Va. 314, 320, 465 S.E.2d 416, 422 (1995).

Our *de novo* review of counsel's performance involves application of a two-pronged test established by the United States Supreme Court:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. pt. 5, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995). When applying the first prong of the test,

> courts must apply an objective standard and determine whether, in light of all the circumstances, the identified acts or omissions were outside the broad range of professionally

4

competent assistance while at the same time refraining from engaging in hindsight or second-guessing of trial counsel's strategic decisions. Thus, a reviewing court asks whether a reasonable lawyer would have acted, under the circumstances, as defense counsel acted in the case at issue.

Syl. pt. 6, *Id.* (in part). In weighing the reasonableness of counsel's performance, the Court's review is highly deferential, and there is a presumption that counsel's performance was not deficient. *Id.* at 16, 459 S.E.2d 127 ("[J]udicial scrutiny of counsel's performance must be highly deferential . . . . [W]e always should presume strongly that counsel's performance was reasonable and adequate." (internal quotations and citations omitted)).

## III.

## ANALYSIS

The petitioner alleges that he received ineffective assistance of counsel from both his trial counsel and his appellate counsel. We proceed by addressing each assignment of error separately.

### A. Assistance of Trial Counsel

At trial, the petitioner was represented by Glyn Dial Ellis.[3] The petitioner's first assignment of error is that he received ineffective assistance of trial counsel because

---

[3] During the pendency of the habeas proceedings, Mr. Ellis passed away prior to providing any testimony concerning his representation of the petitioner.

his counsel failed to request an instruction pursuant to syllabus points 1 and 2 of *State v. W.J.B.*, 166 W. Va. 602, 276 S.E.2d 550 (1981), in which we held:

> 1. "A man attacked in his own home by an intruder may invoke the law of self-defense without retreating." Syllabus point 4, *State v. Preece*, 166 W. Va. 176, 179 S.E. 524 (1935).

> 2. The occupant of a dwelling is not limited in using deadly force against an unlawful intruder to the situation where the occupant is threatened with serious bodily injury or death, but he may use deadly force if the unlawful intruder threatens imminent physical violence or the commission of a felony and the occupant reasonably believes deadly force is necessary.

These syllabus points enunciate the principle commonly known as the "castle doctrine" as it exists in West Virginia.[4] Under the castle doctrine, to justify deadly force resulting in death, the occupant must show that the assailant was an intruder, that the intruder threatened imminent physical violence or the commission of a felony, and that the occupant reasonably believed deadly force was necessary.

Although the jury was not instructed on the castle doctrine at trial, it did receive a self-defense instruction. The Court stated the law on self-defense in syllabus point 1 of *State v. Baker*, 177 W. Va. 769, 356 S.E.2d 862 (1987):

> The amount of force that can be used in self-defense is that normally one can return deadly force only if he

---

[4] *See W.J.B.*, 166 W. Va. at 612, 276 S.E.2d at 556 ("[T]here is still basic vitality to the ancient English rule that a man's home is his castle, and he has the right to expect some privacy and security within its confines.").

6

> reasonably believes that the assailant is about to inflict death or serious bodily harm; otherwise, where he is threatened only with non-deadly force, he may use only non-deadly force in return.

Pursuant to this syllabus point, one is only justified in using deadly force in self-defense if he reasonably believes that the assailant will imminently inflict death or serious bodily harm.

The circumstances justifying homicide under the castle doctrine and self-defense are different; while a person is limited to using deadly force in self-defense when he fears death or serious bodily harm, a person may use deadly force in his home when he believes the assailant is threatening physical violence or the commission of a felony. Thus, the threshold for justifying homicide under the castle doctrine is lower than under a traditional theory of self-defense.

The petitioner posits that evidence was presented during his trial warranting a jury instruction on the castle doctrine. Specifically, the petitioner testified that the victim was not invited into the home and that he feared for his life when the victim threatened him with a gun. Furthermore, during closing arguments, his trial counsel appears to have relied on the castle doctrine, but only in part, in stating:

> Now when I'm in my home, I don't have to run from you. I can stand my ground, and I've been taught that ever since I was a boy, and I know a lot of men that have died under it. They mistakenly believed that they could go into people's homes or go into their business. You can't do it.
> . . . .

7

> He said Bill didn't leave when the guy kicked him,
> said Bill didn't call the police when the guy kicked him.
> That's true. He sure didn't. But he didn't leave either, did he?
> He stayed right there with his home, and when the guy fought
> him, then he shot him. It's a very simple matter.

The petitioner argues that under the first prong of the test set forth in *Miller*, his trial counsel was objectively unreasonable in failing to request a jury instruction on the castle doctrine, particularly after developing facts that would support the same.

Upon our *de novo* review, giving deference to trial counsel, we conclude that the petitioner received effective assistance of counsel despite counsel's choice not to request a jury instruction on the castle doctrine. We do not believe that the petitioner has overcome the presumption that counsel was ineffective. It is our belief that it was counsel's trial strategy to rely solely on self-defense, and under the facts of this case, the strategy was objectively reasonable.

Counsel could have reasonably concluded that he could not convince a jury that the victim was an intruder within the meaning of syllabus point 2 of *W.J.B.* While the Court has not defined "intruder" as it is used in the castle doctrine, Black's Law Dictionary 842 (8th ed. 2004) defines an intruder as "[a] person who enters, remains on, uses, or touches land or chattels in another's possession without the possessor's consent." According to the petitioner's own testimony, he drank beer with the victim for two hours prior to the shooting. Although the victim may have entered the home without the petitioner's permission, the jury could have reasonably inferred from the facts of this

8

particular case that the victim later received implicit permission to remain on the property. Under these facts, it would be reasonable for trial counsel to believe that a jury instruction on the castle doctrine would have confused the jury or generally weakened the defense if given in addition to a self-defense instruction.

*Miller* also dealt with the issue of whether counsel's decision to not request a particular jury instruction constituted ineffective assistance of counsel. In finding that counsel's performance was reasonable, the Court said:

> Having presented substantial evidence, counsel was not required to develop every conceivable defense that was available. Nor was counsel required to offer a defense or instruction on every conceivable defense. What defense to carry to the jury, what witnesses to call, and what method of presentation to use is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess. Obviously, lawyers always can disagree as to what defense is worthy of pursuing "such is the stuff out of which trials are made." *Solomon v. Kemp*, 735 F.2d 395, 404 (11th Cir.1984), *cert. denied*, 469 U.S. 1181, 105 S.Ct. 940, 83 L.Ed.2d 952 (1985).
>     . . . .
> We hold that the mere fact that trial counsel failed to offer a viable defense instruction is not alone a sufficient ground to prove ineffectiveness of counsel.

*Miller*, 194 W. Va. 3, 16–17, 459 S.E.2d 114, 127–28. Following *Miller*, although the facts of the instant case may have been sufficient to warrant a castle doctrine instruction, trial counsel's reliance on self-defense was not unreasonable, and the first prong of the *Miller* test has not been met. Because both prongs of the test must be satisfied to establish ineffective assistance of counsel, we need not proceed to evaluate the second prong with

9

respect to this assignment of error. We conclude that the circuit court did not err in finding that trial counsel effectively represented the petitioner.

### B. Assistance of Appellate Counsel

Appellate counsel, M. Timothy Koontz, was appointed to represent the petitioner following the petitioner's conviction. Thereafter, on June 24, 2001, this Court denied hearing the petitioner's direct appeal. The petitioner's second assignment of error is that appellate counsel was ineffective because he did not request a copy of the transcript of a suppression hearing held on February 23, 2000, so that the transcript could be presented to the Court along with the appellate brief and the rest of the appellate record. The petitioner asserts that without that transcript, appellate counsel could not have effectively argued to this Court that the circuit court had erred by failing to suppress certain physical and testimonial evidence. Both the petitioner and the State acknowledge that the full transcript of the suppression hearing is no longer available.

Prior to the petitioner's trial, trial counsel made a motion to suppress certain evidence on multiple grounds, including the following: "There were no exigent circumstances involved in this matter which allowed the State to either search or arrest without a search warrant or arrest warrant. . . . No arrest warrant was ever received by the State from any independent judiciary." The trial court denied the motion to suppress during the hearing. In a post-trial order denying the petitioner's motion to set aside his conviction, the trial court readdressed the issues raised in the suppression hearing, finding

10

"that circumstances existed at the time officers arrived and further that the facts were such as to permit officers to examine the scene of the crime without first obtaining a search warrant." This issue was mirrored in the petitioner's appellate brief, which stated, "The trial court erred in not granting defendant's motion to suppress the fruits of the search of his home, his person, or his parents' home after the killing." (Citation to the appellate record omitted).

We begin our analysis by noting that a trial transcript may not always be necessary for an appeal. *See Johnson v. McKenzie*, 159 W. Va. 795, 799, 226 S.E.2d 721, 724 (1976) ("[T]his State does not require a transcript of trial proceedings as a condition precedent to the right of appeal . . . ."). For instance, in appeals that only involve questions of law, the facts as developed on the record are unnecessary for the disposition of a case. However, where the facts themselves are in dispute or the application of law to the facts is at issue, a transcript may be necessary. Whether counsel was ineffective for failing to provide a transcript to this Court depends entirely on the details of the case. Therefore, in determining whether appellate counsel was ineffective by failing to request a transcript, the Court must evaluate whether the petitioner was actually prejudiced by not having that transcript on appeal. *See* syl. pt. 8, *State v. Graham*, 208 W. Va. 463, 541 S.E.2d 341 (2000) ("Omissions from a trial transcript warrant a new trial only if the missing portion of the transcript specifically prejudices a defendant's appeal.").

11

In the instant case, the petitioner contends that he "may very well have prevailed on his claimed Fourth Amendment violation had the suppression hearing transcript been available for appeal." The petitioner bases this assertion on two aspects of testimony given by a police officer, Trooper Doug Gunnoe, who investigated the shooting. First, the petitioner argues that Trp. Gunnoe's testimony before the grand jury and before the trial court was inconsistent. Second, the petitioner argues that ammunition seized in the petitioner's home was seized in violation of the petitioner's Fourth Amendment rights.[5]

> Trp. Gunnoe testified as follows before the grand jury:
>
> > The day was Friday, September 3, 1999, and the approximate time that I received the call was about 1716 hours. I received radio traffic from 911 communications reference [sic] a possible shooting . . . in Logan County.
> > Myself and Trooper Roger Johnson were responding to the call.
> > . . . .
> > Not knowing whether the accused was still armed and on the scene or whether he was at his parents [sic], I decided to split with Trooper Johnson. I sent Trooper Johnson to the residence of the accused's parents, and I proceeded to the location where the victim was reportedly at.

---

[5] "The Fourth Amendment to the United States Constitution and Article III, Section 6 of the Constitution of West Virginia protect the public from unreasonable searches and seizures by governmental officials." *Ullom v. Miller*, 227 W. Va. 1, 7, 705 S.E.2d 111, 117 (2010). "The Fourth Amendment applies to the states through application of the Fourteenth Amendment of the United States Constitution. Article 3, Section 6 of the West Virginia Constitution is generally construed in harmony with the Fourth Amendment of the United States Constitution." *Id.* at 7 n.4, 705 S.E.2d at 117 n.4 (citations omitted).

12

At that point I proceeded on foot to the residence where the crime occurred and cleared the residence to make sure that the accused was not armed and running around outside the residence.

. . . .

So I went inside the house and did what we call a protective sweep for my own protection. Once I cleared the house and was satisfied that the accused wasn't on the scene, I went back down to the victim's location. I went back down to where the victim was, and I called his name once again with no response.

. . . .

After obtaining their statements, I allowed both Gary Price and Violet Maynard to leave the scene.

At approximately 1910 hours that day, myself and Trooper Johnson returned to the house to complete our crime scene work. Trooper Johnson started a rough crime scene drawing, and I was assisting by taking various measurements.

. . . .

We entered the bedroom of the accused which is upstairs in the residence and observed a live round of ammunition on his nightstand. It was one single .357 Magnum round. We also observed a night stand on the opposite side of the bed and observed that the top drawer of that night stand was open. On top of that drawer was a box of .357 Magnum ammunition.

Upon further inspection, we were able to determine that several rounds were missing out of that box of ammunition. We then number [sic] our evidence and took control of the crime scene photographs and did more on the scene work.

Trp. Gunnoe gave similar testimony at trial during direct examination:

Q.     Do you recall being informed . . . as to what had taken place?
A.     Yes, I do.
Q.     Based upon that, what were your actions?
A.     Based upon what was told to me at the scene, I sent Trooper Johnson to the residence where the accused's parents live, and I went inside the crime scene residence.
Q.     What was your purpose for going in the home?

13

A.     Because at that particular time we did not know for sure the exact location of the alleged shooter.

Q.     And you go into the home. What does that do, so you can make sure that they're not still in the home?

A.     So I can protect myself and anybody else that may be on the scene. Just in the event that the shooter would have still been inside his residence.

Q.     Is that what is commonly referred to as like a protective sweep?

A.     Yes, it is.

Q.     What do you do for that then in a sweep? What are your actions at that time?

A.     I go to a particular scene, assess it for any danger for myself or medical personnel and physically examine the scene to try to insure that a potential perpetrator is no longer present.

Q.     By doing that, you walk around there or you draw your gun and go around the house and make sure nobody's hiding in closets or rooms?

A.     If the case warrants it, yes.

Q.     Did you do that in this case?

A.     Yes, I did.

Q.     So you went upstairs and looked around?

A.     Yes, I did.

. . . .

Q.     While looking in one of the bedrooms, did you find any particular items that you might have considered evidence at that time?

A.     Yes. I observed what appeared to be ammunition on the nightstand there in the master bedroom or what I thought was the master bedroom of the residence of the accused.

Q.     Did you at some point come back and take that ammunition into custody as evidence?

A.     Yes, I did.

The petitioner states that the testimony is inconsistent. Specifically, the petitioner argues in his brief that

14

> the police officer who conducted the searches, Trooper Gunnoe, appears to have changed his testimony between the grand jury and trial, originally indicating that on a third search the ammunition was found inside an open drawer, but then later saying that this evidence was on top of the nightstand and plainly visible on the first search. From all of this, it is painfully obvious that appellate counsel failed to undertake even a nominal investigation. This falls short of an acceptable level of appellate performance, and so the habeas court abused its discretion in concluding that Mr. Adkins had not met the first prong of *Strickland*.

First, we note that the petitioner did not raise as error in the instant appeal his original appellate counsel's failure to undertake an adequate investigation; he only assigned as error appellate counsel's failure to request the suppression hearing transcript. Upon our inspection of appellate counsel's brief, we find that nowhere did appellate counsel argue that Trp. Gunnoe's testimony was inconsistent. We fail to see how including a transcript of the suppression hearing in the appellate record would have permitted the Court to investigate inconsistencies—which, as the petitioner now argues, would have resulted in reversal of the petitioner's conviction—when the issue of inconsistencies was never raised.

Furthermore, we simply do not agree with the petitioner's interpretation of Trp. Gunnoe's testimony; his statements were consistent. Trp. Gunnoe did not testify during the grand jury proceeding that he only found ammunition in an open drawer; he testified that he found ammunition on top of one nightstand, and within the open drawer of the other nightstand. This is consistent with his less specific trial statement that he

15

"observed what appeared to be ammunition on the nightstand." Because we find no inconsistencies in Trp. Gunnoe's grand jury testimony and his trial testimony, the suppression hearing transcript would likely have been cumulative of the evidence that was provided to the Court. Any deviation from the testimony quoted herein and the unknown testimony in the suppression hearing transcript is purely speculative, and there are no indications in the appellate record that any deviation did in fact exist. Therefore, with regard to the alleged inconsistencies we cannot find the petitioner has suffered any specific prejudice.

The petitioner argues also that the ammunition was seized in violation of his Fourth Amendment rights. In his brief in the instant case, the petitioner claims that "exigent circumstances did not apply" because "the police had secured the scene, left the building but still guarded the premises, and then re-entered Mr. Adkins' home to collecting [sic] evidence. There were therefore no exigent circumstances justifying any intrusion beyond the first." The petitioner asserts that for the police to have lawfully seized the ammunition, they must have first acquired a warrant.

In West Virginia, the presence of exigent circumstances may justify a search and seizure without a warrant.

> Exigent circumstances exist where there is a compelling need
> for the official action and there is insufficient time to secure a
> warrant, police may then enter and search private premises . .
> . without obtaining a warrant.
> . . . .

16

> Exigent circumstances may exist in many situations: three well recognized situations are when police reasonably believe (1) their safety or the safety of others may be threatened, (2) quick action is necessary to prevent the destruction of potential evidence, or (3) immediate action is necessary to prevent the suspect from fleeing.

*State v. Kendall*, 219 W. Va. 686, 692, 639 S.E.2d 778, 784 (2006) (internal citations and quotations omitted). In *State v. Flippo*, 212 W. Va. 560, 566, 575 S.E.2d 170, 176 (2002) (quoting *Flippo v. West Virginia*, 528 U.S. 11 (1999)), the Court discussed the extent to which such searches may be conducted, stating that "police may make warrantless entries onto premises if they reasonably believe a person is in need of immediate aid and may make prompt warrantless searches of a homicide scene for possible other victims or a killer on the premises." However, a "warrantless search [is] not constitutionally permissible simply because a homicide ha[s] recently occurred." *Id.* When the exigent circumstances allowing police to search and seize a person's property without a warrant dissipate, so does the right of the police to continue its search and seizure. [6]

If evidence is seized while exigent circumstances are not present, the evidence is generally inadmissible at trial as being seized in violation of the Fourth Amendment. There is, however, an exception: seizure of evidence when exigent

---

[6] Exigent circumstances are not necessary when police conduct a protective sweep for weapons. Syllabus point 6 of *State v. Lacy*, 196 W.Va. 104, 468 S.E.2d 719 (1996) ("Neither a showing of exigent circumstances nor probable cause is required to justify a protective sweep for weapons as long as a two-part test is satisfied: An officer must show there are specific articulable facts indicating danger and this suspicion of danger to the officer or others must be reasonable. If these two elements are satisfied, an officer is entitled to take protective precautions and search in a limited fashion for weapons.")

17

circumstances are not present is permissible when the evidence was located in plain view when the exigent circumstances did exist.

> The essential predicates of a plain view warrantless seizure are (1) that the officer did not violate the Fourth Amendment in arriving at the place from which the incriminating evidence could be viewed; (2) that the item was in plain view and its incriminating character was also immediately apparent; and (3) that not only was the officer lawfully located in a place from which the object could be plainly seen, but the officer also had a lawful right of access to the object itself.

Syl. pt. 3, *State v. Julius*, 185 W. Va. 422, 408 S.E.2d 1 (1991).

Pursuant to *Kendall* and *Flippo*, and based upon the testimony of Trp. Gunnoe, we find that exigent circumstances were present at the time Trp. Gunnoe conducted the protective sweep of the petitioner's home. Trp. Gunnoe entered the home to render aid to a shooting victim he could see lying in the house, and because he did not know if the shooter was still present and dangerous, he conducted a protective sweep. It was during the lawful protective sweep that Trp. Gunnoe first witnessed the ammunition in the petitioner's bedroom.

However, we agree with the petitioner that exigent circumstances did not exist at the time the ammunition was seized by the police. By that point, the petitioner had been arrested, and there was no danger that the ammunition would be destroyed before the police acquired a search warrant. Despite this, we conclude that the evidence was *not* seized in violation of the petitioner's Fourth Amendment rights because it was

18

within plain view when Trp. Gunnoe conducted the protective sweep. Trp. Gunnoe was legally present in the bedroom when he viewed the ammunition, the ammunition was in plain view, its incriminating character was readily apparent—the police were investigating a shooting—and Trp. Gunnoe could have lawfully seized the ammunition during his protective sweep.

Based on the foregoing, we do not believe that the trial court erred by refusing to suppress the ammunition at the petitioner's trial. Furthermore, the petitioner has not alleged the necessity of the suppression hearing transcript in the absence of any evidence that the trial court erred in refusing to suppress the ammunition. Because the petitioner has not been prejudiced by his appellate counsel's decision not to request a transcript of the suppression hearing, we find that appellate counsel's performance was not deficient. Because we conclude that the first prong of the *Miller* test is not satisfied, we need not proceed to evaluate the second prong. Accordingly, the circuit court did not err in denying habeas corpus relief on the ground of ineffective assistance of appellate counsel.

## IV.

## CONCLUSION

For the reasons set forth above, this Court affirms the circuit court's order entered August 9, 2011, denying habeas corpus relief to the petitioner.

Affirmed.